UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| KEENEN R. AGEE, Plaintiff, v. RENO POLICE DEPARTMENT, *et al.,* Defendants. | Case No. 3:24-cv-00306-MMD-CSD ORDER |

## I. SUMMARY

*Pro se* Plaintiff Keenen R. Agee brings this action under 42 U.S.C. § 1983, alleging that the Reno Police Department ("RPD") Officers Jones, Staples and Rose violated his civil rights when Plaintiff was arrested on two occasions in 2023. (ECF Nos. 96 ("Complaint"); 180 (order dismissing Plaintiff's claims against all other defendants).)

Before the Court is Defendants' motion for summary judgement (ECF No. 182 ("Motion"))[1] and Plaintiff's motion for leave to file a sur-reply (ECF No. 192)[2]. For the reasons explained below, the Court grants Defendant's motion for summary judgement and denies Plaintiff's motion for leave to file a sur-reply.

///

///

///

[1]Plaintiff responded. (ECF No. 188.) Defendants replied. (ECF No. 191) Plaintiff also filed a motion for leave to manually file video exhibits as part of his response brief. (ECF No. 187.) Litigants are not required to obtain the Court's approval to submit manual filings, they need only file a notice in accordance with the Court's local rules. *See* LR IC 1-1(d). Considering Plaintiff's *pro se* status, and to the extent the Court received and considered Plaintiff's manual filing in adjudicating the pending motions before the Court, the Court will grant Plaintiff's motion for leave to manually file video exhibits. (ECF No. 187.)

[2]Defendant responded (ECF No. 193) and Plaintiff replied (ECF No. 194,)

## II. BACKGROUND[3]

Plaintiff was arrested by RPD in Reno on two separate occasions in 2023. (ECF No. 96 at 2.) Plaintiff was arrested on February 2 ("February Arrest") by Officer Derek Jones and on May 29 ("May Arrest") by Officers Christopher Rose and Dylan Staples. (ECF No. 96 at 2-3.) All criminal charges resulting from these two arrests were ultimately dropped. (*Id.* at 2.)

### A. February Arrest

#### 1. January 13 Investigation

On January 13, RPD Officers Jones and Hickman responded to a 911 call by Amber Carney from the Sky Mountain apartment complex. (ECF Nos. 182-3 at 2; 182-5 at 6.) Carney told Officer Jones that she saw Plaintiff grab and push her neighbor, Emma DeLeon, and begin kicking on DeLeon's apartment door. (ECF No. 182-8 at 15:42:25-15:43:20, 16:05:15-16:05:30.) Carney provided a written statement to the officers the same day and later appeared for a deposition in this case. (ECF Nos. 182-6; 188-7.)

DeLeon spoke with the officers, telling them she used to date Plaintiff but they were no longer together. (ECF Nos. 182-8 at 15:51:50-15:52:20; 182-9 at 15:41:50-15:42:10, 15:43:30-15:44:00.) She told the officers that she gave Plaintiff a key to the apartment after her temporary protective order against him lapsed, but because she told him she changed the locks, he yanked keys out of her hands that day and then kicked in her door when he realized they weren't her house keys. (ECF Nos. 182-8 at 15:44:20-15:44:52; 182-9 at 15:42:30-15:42:50, 15:44:20-15:44:52.) Hickman took photos of the damage to the front door. (ECF No. 182-10.) DeLeon refused to provide a written statement but her statements to police that day were recorded on body camera footage. (ECF Nos. 182-8, 182-9.) DeLeon submitted a written statement in support of Plaintiff along with his response to the Motion, stating that no physical assault occurred,

[3]The following facts are undisputed unless otherwise noted.

that he had lawful access to the apartment, that she did not witness Plaintiff kick in the door and that the door was already damaged. (ECF Nos. 189 at 18-19 (signed declaration dated February 26, 2026).)

### 2. February 2 Arrest

On February 2, RPD Officers Jones, Collins and Kent followed a vehicle registered to Plaintiff into a parking garage. (ECF No. 96-1 at 5.) The Court received body-worn camera footage from Officers Jones (ECF No. 182-14) and Collins (ECF No. 182-12) as well as dash cam footage from the police squadron (ECF No. 182-13). Jones approached the driver's side of the vehicle, unholstering his firearm in his right hand and holding it behind his right hip. (ECF Nos. 182-14 at 18:51:50-18:52:05, 182-13 at 18:51:50-18:52:05.) Jones confirmed Plaintiff's identity and told Plaintiff he was under arrest and directed him to exit the vehicle. (ECF No. 182-14 at 18:52:00-18:52:20.) Kent approached the front passenger side. (*Id.*) Plaintiff repeatedly asked Jones to explain the charges against him and Jones replied that he would answer once Plaintiff exited the vehicle. *(Id.)* Jones told Plaintiff that if he didn't exit, they would break his window and pull him out of the vehicle. (*Id.* at 18:52:20-18:52:25.) Plaintiff responded that he would exit. (*Id.* at 18:52:25-18:52:35.) Plaintiff remained in the car and asked repeatedly for a sergeant. (*Id.* at 18:52:35-18:54:00.) Jones reiterated that Plaintiff's window would be broken and Plaintiff would be physically removed. (*Id.* at 18:54:45-18:54:55.) Jones warned Officer Collins to "pay attention" because Plaintiff's car was still on and running and told Collins "just don't get hit" if Plaintiff reversed quickly. (*Id.* at 18:56:15-18:56:30.) Plaintiff eventually exited the vehicle and he was handcuffed and taken into custody without further incident. (*Id.* at 18:57:25-18:59:00.)

Plaintiff was charged with felony home invasion and misdemeanor domestic battery. (ECF No. 96-2 at 2.) Both charges were subsequently dismissed without prejudice. (*Id.)*

///

///

**B. May Arrest**

**1. May 28 Investigation**

Around 11:00 pm on May 28, RPD Officers Daniels and Pfaunmiller responded to a 911 call at an apartment complex on Loki Court. (ECF No. 182-15 at 4.) Daniels and Pfaunmiller entered the apartment and found Jessica Appling and her young son. (ECF Nos. 182-16 at 23:02:15-23:03:00; 182-15 at 23:02:15-23:03:00.) Appling told the officers that Plaintiff, her ex and the father of her present child, texted her that night saying he was going to drop off their son at her apartment in violation of their custody agreement. (ECF Nos. 182-16 at 23:03:00-23:03:20; 182-15 at 23:03:00-23:03:20; 189 at 21-28.[4]) Despite texting Plaintiff she wasn't home, Appling told the officers that Plaintiff arrived with their son and started pounding hard on the door and then kicked the door in. (ECF Nos. 182-16 at 23:03:20-23:03:55; 182-15 at 23:03:20-23:03:55.) Appling then recounted how Plaintiff charged her in her bedroom and pinned her to the bed when she noticed her lip was "busted." (ECF Nos. 182-16 at 23:03:55-23:04:07; 182-15 at 23:03:55-23:04:07.) Officer Daniels took pictures of Appling's lip. (ECF No. 182-24.) After the May Arrest, Appling expressly recanted her statements to police. (ECF Nos. 96-1 at 10-12; 189 at 14-16.)

Appling's mother, Laura Appling, arrived at the apartment while the officers were speaking with Appling. (ECF No. 182-16 at 23:05:20-23:05:30.) Officer Pfaunmiller and the child accompanied Laura Appling back to her car. (*Id.* at 23:05:30-23:06:30.) Pfaunmiller interviewed Laura, who told him Plaintiff always had weapons on him even though he wasn't supposed to because Plaintiff was an ex-felon. (*Id.* at 23:06:55-23:07:05).) She told Pfaunmiller that Plaintiff always carries a gun and had stolen police guns. (*Id.* at 23:07:30 -23:07:45.)

---

[4]Plaintiff produced a section of this custody agreement with the Complaint (ECF No. 96-1 at 6) and the full agreement with his response to the Motion (ECF No. 189 at 21-26.) The agreement, dated June 16, 2022, states that Plaintiff will have custody of his son with Appling on weekends until 8:30 pm on Sunday evening but that if his work schedule allows, "his custodial time shall continue to Monday, 10 am." (*Id.* at 25, 26.)

While outside Appling's apartment, the neighbor across the hall spoke to Officer Pfaunmiller through the speaker of a doorbell camera. (*Id.* at 23:16:20-23:26:30.) The neighbor, later identified as Zach Espinoza, explained that he was out of town but that his camera captured the incident. (*Id.* at 23:16:30-23:26:45.) Pfanmiller spoke on the phone with Espinoza, who recounted what he saw through the camera and sent the video footage from his Blink doorbell camera. (Id. at 23:17:50-23:26:15.) Defendants filed three 20-second clips from this camera with the Court. (ECF Nos. 182-20, 182-21, 182-22.) The first clip shows Plaintiff's son standing by Appling's apartment door and Plaintiff approaching and repeatedly banging on the door, telling his son "I really hate your mama." (ECF No. 182-20.) The second clip shows Plaintiff repeatedly kicking the door and then turning the handle and pushing the door open. (ECF No. 182-21.) The final clip shows Plaintiff exiting, Appling following him yelling "give me back my phone," their son screaming and crying, and Appling asking someone upstairs to call 911. (ECF No. 182-22.)

Officer Daniels prepared a Declaration of Probable Cause that same night, recounting the incident and identifying probable cause for four felonies and one misdemeanor. (ECF No. 182-38.) RPD Officer O'Farrell sent an email out to all RPD officers at 7:30 am on May 29, stating Daniels had "PC" for Plaintiff for the five enumerated charges. (ECF No. 182-27.) The email contained a bolded notice highlighted in red near the top of the email: "***KEENAN MAY ALSO BE IN POSSESSION OF MULTIPLE STOLEN FIREARMS PER THE VICTIM***" (*Id.* at 2.)

**2. May 29 Arrest**

Upon receiving the probable cause email, undercover RPD Officers Staples and Rose began surveilling one of Plaintiff's reported addresses in two unmarked police vehicles. (ECF Nos. 182-28 at 2, 182-31 at 2.) The officers saw Plaintiff pull into the parking lot of the apartment complex in one of his registered vehicles. (*Id.*) Both officers were in plain clothes with black tactical vests marked "POLICE" in bold white lettering. (ECF Nos. 182-28 at 2-3; 182-31 at 2-3.) Officer Staples exited his vehicle and

approached Plaintiff, who was holding his car keys, and told Plaintiff he was being detained. (ECF No. 182-29 at 14:58:07-14:58:27.) Plaintiff responded, "I am not being detained, you are not detaining me." (*Id.* at 14:58:25-14:58:31.) Plaintiff repeatedly asked Staples what he was being detained for and then started walking away from Staples and towards his car, stating he was getting his phone to record while keeping his hands in the air. (*Id.* at 14:58:30-14:58:43.) Plaintiff continued to yell at the officers while Staples took Plaintiff's hands behind his back and placed him in handcuffs. (*Id.* at 14:58:40-14:58:50.) Plaintiff repeatedly yelled "you're arresting me" to which Staples repeatedly responded "no, I'm not." (*Id.*) Officer Rose approached and held Plaintiff's left arm to assist with handcuffing. (*Id.* at 14:58:45-14:59:00.) Plaintiff told the officers he was going to sue them, a statement he reiterated throughout the interaction. (*Id.* at 14:58:50-14:59:00.) Staples and Rose both asked Plaintiff if he had anything on him they should know about but Plaintiff did not answer and instead asked why he was being arrested. (*Id.* at 14:59:00-14:59:15.) After Staples answered "for the thing that happened the other day," Plaintiff began yelling "shut the fuck up" and "come on…this is bullshit… I didn't do shit." (*Id.* at 14:59:15-14:59:35.) When Plaintiff then said "I wanna go…I'll sit down" and started walking away, Staples told Plaintiff "stop fucking pulling away." (*Id*. at 14:59:50-15:00:00.)

The officers then walked Plaintiff to the front seat of one of the unmarked cars to which Plaintiff exclaimed "this is fraud, you're putting me in the front seat? This is fraud, right now this is fraud…fraudulent charges, it is fraudulent bitches, y'all some hos." (*Id*. at 15:00:30-15:00:50.) Plaintiff then pulled his right arm away from Staples grasp moving towards the vehicle yelling "let me the fuck go, let me go bitch, let me go." (*Id.* at 15:00:45-15:01:10.) The officers moved Plaintiff against the outside of the car and Plaintiff yelled at Rose that he was trying to follow orders and sit down while Staples radioed for back-up. (*Id*. at 15:01:10-15:01:40.) Plaintiff directed Rose to place Plaintiff's car keys in Plaintiff's pockets. (*Id.* at 15:01:40-15:01:50.) Rose asked Plaintiff to calm down to which Plaintiff yelled back "you're arresting me for shit, no I can't!" (*Id.* at

15:01:50-15:02:00.) Plaintiff continued to yell at officers and then at passersby. (*Id*. at 15:02:00-15:02:50.) Plaintiff again repeatedly asked officers what he was being arrested for and the officers explained the multiple felony charges. (*Id.* at 15:02:50-15:03:10.) Plaintiff continued yelling, saying he needed to call his lawyer and yelling that marked cop cars were passing. (*Id.* at 15:03:10-15:03:43.) Plaintiff then again yanked his right arm away from Staples yelling "let me the fuck go, he got me" (*Id.* at 15:03:40-15:03:50.) The officers pressed Plaintiff against the police vehicle but Plaintiff continued to turn his head and goad the officers. (*Id.* at 15:03:45-15:03:55.) The officers then took Plaintiff to the ground while Plaintiff continued to taunt the officers, which he continued while on the ground. (*Id.* at 15:03:50-15:04:30.)

Plaintiff ended up on his side with his head up towards the officers. (ECF Nos. 182-29 at 15:04:00-15:04:20; 182-32 at 15:04:00-15:04:20.) The body camera footage does not capture Plaintiff's hands at this moment but in his declaration, Staples recounts that Plaintiff grabbed his police vest. (ECF No. 182-28 at 4.) In the footage, Staples can be heard telling Plaintiff "let go of my fucking vest." (ECF No. 182-29 at 15:04:20-15:04:25.) The officers moved Plaintiff into a prone position, with Staples' knee on Plaintiff's back. (ECF No. 182-32 at 15:04:25-15:05:05.) Staples then pressed Plaintiff's fingers back, manipulating Plaintiff's handcuffed wrists into a restraint. (*Id.* at 15:04:40-15:05:10.) After about a minute, the officers rolled Plaintiff onto his side, releasing the wrist restraint. (*Id.* at 15:04:50-15:05:10.)

Back-up officers arrived in a marked car with a WRAP.[5] (ECF No. 182-29 at 15:06:10-15:06:50.) Staples and Rose, with assistance from the back-up officers, returned Plaintiff to the prone position to velcro the WRAP restraint on Plaintiff's legs and torso. (ECF Nos. 182-32 at 15:07:10-15:08:05; 182-29 at 15:07:10-15:08:05.) After

[5]"A 'WRAP' is a restraint device that consists of a fabric placed from approximately the waist down to the lower legs and immobilizes the legs, thereby preventing a detainee from kicking or otherwise using his lower body to cause an injury to himself or others." *Rocha v. City of Antioch*, No. 19-CV-07312-MMC, 2021 WL 916910, at *1 n.2, (N.D. Cal. Mar. 10, 2021).

the officers raised Plaintiff to a seated position, officers observed abrasions on Plaintiff's shoulders and took pictures. (ECF Nos. 182-32 at 15:08:15-15:10:20; 182-36.) During this time, Plaintiff continued to yell expletives and tell officers he would sue them. (ECF No. 182-32 at 15:08:15-15:10:20.) Eventually, Plaintiff was carried into a police car, despite Plaintiff demanding that he be taken by ambulance for medical treatment. (ECF Nos. 182-32 at 15:11:10-15:12:00; 182-19 at 15:11:10-15:12:00.)

Approximately 30 minutes later, Staples and Rose searched Plaintiff's vehicle. (ECF Nos. 182-30; 182-33.) While not captured on their body cameras, the officers both state in their declarations that before searching, Rose looked through the driver side passenger window and saw what appeared to be a firearm trigger guard and a plastic rifle magazine in a diaper bag on the back seat. (ECF Nos. 182-31 at 4; 182-28 at 4.) The officers conducted a criminal history check and confirmed Plaintiff had a prior felony conviction. (*Id.*) Rose unlocked the car and immediately went to the backseat to search the diaper back, taking out a black plastic magazine first, then a Pioneer Arms AK 47 pistol and 10 unfired rounds. (ECF Nos. 182-33 at 15:42:15-15:45:10; 182-31 at 4.)

Plaintiff was charged with felony home invasion, felony child abuse or neglect, felony prevention of reporting a crime, felony prohibited possession of a firearm, misdemeanor resisting an officer, and misdemeanor domestic battery. (ECF No. 96-2 at 1.) All charges were subsequently dismissed without prejudice for insufficient evidence and absence of witnesses. (*Id.* at 1, 12.)

## III. DISCUSSION

### A. Legal Standard

Defendants seek summary judgment on all of Plaintiff's claims. (ECF No. 182.) Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of showing that there are no genuine issues of material fact. *See Zoslaw v. MCA Distrib. Corp.*, 693

F.2d 870, 883 (9th Cir. 1982). Once the moving party satisfies the requirements outlined in Federal Rule of Civil Procedure 56, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). All justifiable inferences should be drawn in the non-movant's favor. *See id.* at 255.

**B. Overview of Claims**

Liberally construing Plaintiff's pleadings,[6] Plaintiff brings five claims arising from the two arrests. He pleads two claims of false arrest, two claims of excessive force, and one unlawful search claim.[7] Through these claims, Plaintiff alleges that his Fourth Amendment rights were violated. The Fourth Amendment protects against "unreasonable searches and seizures." U.S. const. amend. IV. Section 1983 authorizes civil suits against persons who commit constitutional violations while acting under color of law. *See* 42 U.S.C. § 1983. Through this § 1983 lawsuit, Plaintiff alleges Defendants violated his Fourth Amendment rights in three different ways.

First, Plaintiff argues he was falsely arrested twice. (ECF No. 96 at 1-2.) "A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was made without probable cause or other justification." *Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 964-65 (9th Cir. 2001) (citation omitted). "[A] warrantless arrest requires probable cause." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (internal citation omitted). "Probable cause for a warrantless arrest exists if 'under the totality of the facts and circumstances known to the arresting officer, a prudent person would have concluded that there was a fair probability that the

---

[6]Pleadings from *pro se* litigants like Plaintiff must be liberally construed. *See Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

[7]Plaintiff argues his malicious prosecution claim survives summary judgement. (ECF No. 188 at 9.) However, the Court already dismissed Plaintiff's malicious prosecution claim. (ECF No. 180 at 9-11.) In granting Defendants' earlier motions to dismiss, this malicious prosecution claim was the only one the Court granted Plaintiff narrow leave to amend. (*Id*. at 10, 19.) However, Plaintiff never filed a fourth amended complaint. Accordingly, Plaintiff presently has no malicious prosecution claim.

suspect had committed a crime.'" *United States v. Fixen*, 780 F.2d 1434, 1436 (9th Cir. 1986) (internal quotations omitted).

Probable cause is a complete defense to false arrest claims brought under § 1983. *See Devenpeck v. Alford*, 543 U.S. 146, 152 (9th Cir. 2004). ("[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed."); *Tayvion Posey v. Las Vegas Metropolitan Police Department*, No. 2:23-CV-01936-GMN-MDC, 2025 WL 2280495, at *6 (D. Nev. Aug. 8, 2025) ("[A]n officer is not liable for damages based on a claim of false arrest if there was probable cause to make the arrest." (citing *Pierson v. Ray*, 386 U.S. 547, 555 (1967))). Even if charges are later dropped or the person arrested is subsequently acquitted, a showing of probable cause at the time of arrest defeats a § 1983 false arrest claim. *See Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979) ("The validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest."); *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995) ("[T[he mere fact a prosecution was unsuccessful does not mean it was not supported by probable cause.").

Second, Plaintiff argues Defendants unlawfully applied excessive force while effectuating his arrests. (ECF No. 96 at 1-2.) To determine whether the use of force by a law enforcement officer was excessive under the Fourth Amendment, a court must assess whether it was objectively reasonable "in light of the facts and circumstances confronting [the officer], without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 388, 397 (1989). This evaluation of reasonableness balances the "extent of the intrusion on the individuals' Fourth Amendment rights against the government's interests" *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (citations omitted). The Court looks to the following factors when assessing reasonableness of force: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether

he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

Finally, Plaintiff claims officers conducted an unlawful search of his vehicle after the May Arrest. (ECF No. 96 at 3.) Warrantless searches are "per se unreasonable" under the Fourth Amendment and "subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). Defendants cite two established warrant exceptions: the plain view exception and the automobile exception. (ECF No. 182 at 32-33); *see Horton v. California*, 496 U.S. 128, 133 (1990); *California v. Carney*, 471 U.S. 386, 390 (1985). "The plain-view exception allows the warrantless seizure of incriminating evidence and requires (1) the officer not violate the Fourth Amendment in arriving at the place from which the evidence can be seen (2) the item be in plain view, and (3) the item's incriminating nature is immediately apparent." *Horton*, 496 U.S. at 136. "[A]ny automobile is subject to search without warrant on reasonable cause to believe it contains contraband." *United States v. Di Re*, 332 U.S. 581, 586 (1948). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982).

The Court addresses each of these claims as they relate to the two separate incidents: the February Arrest and the May Arrest. Ultimately, the Court finds there is no genuine dispute of material fact and rules in favor of Defendants on all claims as a matter of law.

**C. February Arrest Claims**

Plaintiff raises false arrest and excessive force claims against Officer Jones. (ECF No. 96 at 2.) Defendants move for summary judgement, arguing Jones had probable cause at the time of Plaintiff's arrest, applied reasonable force upon Plaintiff's arrest, and that Jones is protected from excessive force claims by qualified immunity. The Court agrees with the first two arguments and does not address qualified immunity.

**1. False Arrest**

Defendants argue Jones had probable cause to believe that Plaintiff committed two crimes against DeLeon approximately three weeks before the February Arrest: felony home invasion and misdemeanor domestic battery. (ECF No. 182 at 14 (citing NRS §§ 205.067(2), 200.485)[8].)

The Court finds Officer Jones had probable cause to arrest Plaintiff on February 2, 2023 for domestic battery. During the investigation on January 13, DeLeon made statements to Officer Jones and Hickman recorded on their body camera indicating she had been in a dating relationship with Plaintiff and that he yanked her keys out her hands that day. (ECF Nos. 182-8 at 15:51:50-15:52:20, 15:52:05-15:54:05; 182-9 at 15:41:55-15:42:10, 15:42:30-15:42:50, 15:43:30-15:44:00.) In recorded oral statements, DeLeon's neighbor, Amber Carney, told officers that Plaintiff grabbed, pushed, and shoved DeLeon. (ECF No. 182-8 at 15:42:25-43:20, 16:05:15-16:05:30.) Carney corroborated this account with a written statement she provided to the police. (ECF No. 182-6 at 3.) From these "facts and circumstances known to the arresting officer, a prudent person would have concluded that there was a fair probability that [Plaintiff] had committed a crime." *United States v. Struckman*, 603 F.3d 731, 739 (9th Cir. 2010).

In response, Plaintiff questions DeLeon's credibility, citing a declaration she submitted in support of Plaintiff stating, "Mr. Agee did not push me" and "[t]here was no physical altercation" and "I declined to provide a written statement because no physical assault occurred and I did not believe criminal charges were appropriate." (ECF Nos. 188 at 4; 189 at 18-19.) However, "[w]hether that arrest was constitutionally valid depends in turn upon whether, *at the moment the arrest was made*, the officers had probable cause to make it—whether *at that moment* the facts and circumstances within

---

[8]A person is guilty of domestic battery under Nevada law if they unlawfully apply force or violence against any person with whom they have or had a dating relationship. *See* NRS §§ 200.481(1)(a), 200.485(1)(a), 33.018(1). An individual is guilty of home invasion when they "by day or night, forcibly enter[] a dwelling without permission of the owner, resident or lawful occupant." *Id.* at § 205.067(1-2).

their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964) (citations omitted) (emphasis added). DeLeon did not recant her statements to police until after the February Arrest. (ECF No. 189 at 19 (statement dated February 26, 2026).) Jones could not have anticipated DeLeon's retraction and relied on her January 13 statements as "reasonably trustworthy information" sufficient to establish probable cause. *Beck*, 379 U.S. at 91. Moreover, DeLeon's statement reiterates that she had a dating relationship with Plaintiff (ECF No. 189 at 19 ("At the time of the incident, I was emotionally upset due to personal relationship issues, including learning that Mr. Agee had fathered a child during our relationship.")) and Carney reiterated in her later deposition that she witnessed Plaintiff use force against DeLeon. (ECF No. 188-7 at 21-22.) In sum, the Court finds Jones reasonably believed at the time of the February Arrest that Plaintiff committed misdemeanor domestic battery.

Additionally, the Court finds Jones reasonably concluded there was at least a fair probability Plaintiff committed felony home invasion as well. DeLeon told the officers in recorded statements that Plaintiff kicked in her apartment door, "forcibly enter[ing] [her] dwelling without permission of the owner, resident or lawful occupant." NRS § 205.067(1); (ECF Nos. 182-9 at 15:42:16-15:42:58; 182-8 at 16:01:38-16:01:42).

Plaintiff challenges Defendants' reliance on images of DeLeon's damaged door frame. (ECF Nos. 188 at 5 ("Minor interior frame damage does not conclusively establish a forced kick-in."); 182-10 (photographs Officer Hickman took of DeLeon's front door).) But to overcome Plaintiff's false arrest claim, Defendants do not need to prove Plaintiff did in fact kick the door down: only that Jones *reasonably believed* Plaintiff kicked the door down. *See Texas v. Brown*, 460 U.S. 730, 742 (1983) (probable cause "does not demand any showing that such a belief be correct or more likely true than false"). DeLeon told the officers that Plaintiff took her keys and then kicked the door in when she didn't have the house keys on her. (ECF Nos. 182-9 at 15:42:16-

15:42:58; 182-8 at 16:01:38-42). Carney told Jones she saw Plaintiff kicking at DeLeon's door (ECF No. 182-8 at 15:42:55-15:43:15, 16:05:05-16:05:30) which she reiterated in her written witness statement (ECF No. 182-6 at 3).[9] This testimony from DeLeon and Carney, paired with the evidence of the damaged door, afforded Jones probable cause that Plaintiff "forcibly enter[ed] a dwelling without permission of the owner, resident or lawful occupant." NRS § 205.067(1).

Plaintiff argues that the officers knew he had a key to DeLeon's apartment and therefore he could not have had the criminal intent to commit burglary. (ECF No. 188 at 4); *see State v. White*, 330 P.3d 482, 483-84, 486 (2014) (finding a husband who owned the house where he previously resided with his wife, maintained an "absolute right to enter the residence and did not forfeit any possessory right" when he entered the house with a key he maintained to stay there with the kids on weekends, and therefore did not have the criminal intent to commit burglary in the house under NRS § 205.060(1).) The Court need not address this issue, since the Court finds Jones had probable cause for crime Plaintiff was charged with, home invasion, rather than burglary. (ECF No. 96-2 at 1.) Unlike Nevada's burglary statute, the home invasion statute expressly criminalizes any forced entry "without permission of the owner, resident or lawful occupant." *Compare* NRS § 205.060 with § 205.067(1). DeLeon recounted to the officers that she told Plaintiff two days earlier that she had changed the locks, although she wasn't able to change them before the January 13 incident. (ECF Nos. 182-8 at 15:44:25-15:44:52; 182-9 at 15:44:25-15:44:52.) DeLeon also told the officers that Plaintiff was not a resident, was not listed on the lease, hadn't stayed there in five months, nor did he have

---

[9]Plaintiff cites Carney's admission at a later deposition in this litigation that she did not actually see Plaintiff successfully kick open the door, only kick at it. (ECF No. 188 at 4-5 (citing ECF No. 182-7 at 24, 43, 53).) Again, while this testimony might undermine a jury's conclusion that Plaintiff actually kicked in the door beyond a reasonable doubt, the Court finds Carney's statements to police that Plaintiff was kicking at DeLeon's door contribute to "the totality of the facts and circumstances known to the arresting officer [such that] a prudent person would have concluded that there was a fair probability that [Plaintiff] had committed a crime." *Struckman*, 603 F.3d at 739.

any belongings at the apartment. (ECF Nos. 182-9 at 15:41:25-15:41:30, 15:41:50-15:41:55; 182-8 at 15:49:30-15:50:15.) Accordingly, the Court finds that Officer Jones reasonably believed Plaintiff was not the "resident or lawful occupant" of the apartment nor did DeLeon grant him permission to enter. NRS § 205.067(1).

Because Jones had probable cause to arrest Plaintiff for misdemeanor domestic battery and felony home invasion, the Court grants judgement in favor of Defendants on Plaintiff's February False Arrest claim.

**2. Excessive Force**

Defendants argue Plaintiff's excessive force claim against Jones for his actions during the February Arrest must fail because the arresting officers acted reasonably and are protected by qualified immunity. (ECF No. 182 at 17-21.) Plaintiff did not respond to this argument. (ECF No. 188.) The Court finds the officers acted reasonably.

The Court agrees with Plaintiff that he "exited [the vehicle] under coercion," citing Officer Jones's verbal threats that Plaintiff's window would be broken and he would be physically extracted from his vehicle if Plaintiff did not comply. (ECF No. 188 at 6.) Defendants also concede that Jones "unholstered his firearm, held it behind his right hip, and threatened to break Plaintiff's vehicle window if he did not exit." (ECF No. 182-14). However, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Hopson v. Alexander*, 71 F.4th 692, 705 (9th Cir. 2023) (quoting *Graham*, 490 U.S. at 396).

The Ninth Circuit recognizes excessive force claims where law enforcement does not apply physical contact but instead draws a firearm on an individual. *See Robinson v. Solano County*, 278 F.3d 1007 (9th Cir.2002); *Motley v. Parks,* 432 F.3d 1072 (9th Cir. 2005), *overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012); *but see Medrano v. Acosta*, No. 24-6346, --- F.4th ----, 2026 WL 2881583 (9th Cir. Sept. 25, 2026) (finding officers' drawing and pointing their firearms at a felony suspect's head did not constitute excessive force in violation of the Fourth Amendment). However, law enforcement in those cases pointed guns directly at a compliant and

unarmed misdemeanor suspect in one case and a five-week-old infant in another. *See Robinson*, 278 F.3d at 1010, 1014-15; *Motley,* 432 F.3d at 1088-89; *see also McKenzie v. Lamb*, 738 F.2d 1005, 1010 (9th Cir.1984) (finding excessive force where officers "pressed the barrels of their guns against appellants' heads"). While "pointing guns at a suspect is deemed a high level of force," Jones here did not point his gun at Plaintiff. *Thompson v. Rahr*, 885 F.3d 582, 586 (9th Cir. 2018); (ECF No. 182-14 at 18:51:55-18:57:41). Jones drew his weapon but kept it behind his hip and out of Plaintiff's line of sight. (ECF No. 188-14.) In this way, Jones did not use the drawn weapon to coerce Plaintiff into compliance. Jones only applied verbal coercion, stating that law enforcement would break the window and physically extract Plaintiff if he did not exit the vehicle on his own. The Court finds this "type and amount of force inflicted" to be minimal. *Espinosa*, 598 F.3d at 537 (citation omitted).

Under the *Graham* factors, the Court finds this minimal threat of physical force Jones used to effectuate Plaintiff's arrest was objectively reasonable. *See Graham*, 490 U.S. at 396. First, the crime at issue was sufficiently severe, specifically felony home invasion in addition to the misdemeanor domestic battery change. Second, Plaintiff posed an immediate threat to the safety of the officers by remaining in a running vehicle, which Jones noted posted a safety risk to fellow officers if Plaintiff quickly reversed. Finally, Plaintiff was not complying with law enforcement's orders to step out of the vehicle, by which means he could have quickly fled the scene. All of these factors indicate some use of force would have been reasonable. And yet, Jones relied on verbal commands alone to obtain compliance.

In sum, the Court finds Jones acted reasonably in applying verbal coercion and unholstering his weapon out of Plaintiff's sight. The Court accordingly grants Defendants' Motion on Plaintiff's excessive force claim as to the February Arrest on this ground.[10]

---

[10]Because the Court finds Jones acted reasonably and therefore did not violate the Fourth Amendment in effectuating Plaintiff's February Arrest, the Court does not

**D. May Arrest**

Plaintiff raises false arrest,[11] excessive force, and unlawful search claims against Officers Rose and Staples. (ECF No. 96 at 3.) Defendants argue the officers had probable cause, applied reasonable force, are entitled to qualified immunity, and lawfully searched Plaintiff's vehicle.

**1. False Arrest**

Defendants argue Staples and Rose had probable cause to arrest Plaintiff on May 29 based on the collective knowledge doctrine from an investigation by fellow RPD officers the night before. (ECF No. 182 at 21-26.) Plaintiff challenges the information officers relied on to establish probable cause. (ECF No. 188 at 3-4, 5, 6.) The Court agrees with Defendants.

Rose and Staples arrested Plaintiff on May 29 on charges of misdemeanor domestic battery under NRS § 200.485.(1)(a), felony prevention of a 911 call under NRS § 199.305, felony child endangerment under NRS § 200.508.(1)(b)(1), felony burglary under NRS § 205.060.1A, and felony home invasion under NRS § 205.067.1. (ECF No. 182 at 21-23.) Defendants can defeat Plaintiff's false arrest claim by

---

reach Defendants' alternative qualified immunity argument. Moreover, the Court finds Defendants' one-sentence argument unpersuasive. (ECF No. 182 at 21); *see Ramirez v. Las Vegas Metropolitan Police Department*, No. 2:24-CV-02238-MMD-DJA, 2026 WL 2349960, at *4 (D. Nev. Aug. 13, 2026). However, the Court acknowledges that it is not clearly established under Supreme Court or Ninth Circuit precedent "that merely unholstering a firearm, without more, constitutes excessive force." *Foster v. City of Indio*, 908 F.3d 1204, 1218 (9th Cir. 2018).

[11]In his Complaint, Plaintiff does not list false arrest among his claims against Rose and Staples. (ECF No. 96 at 3.) However, liberally construing Plaintiff's *pro se* Complaint and pleadings, Plaintiff appears to argue false arrest. Considering Defendants address this claim on the merits in their Motion, (ECF No. 182 at 21-26), the Court will adjudicate this claim. By contrast, the Court will not address what Defendants label a "veiled deliberate indifference claim." (*Id.* at 30.) Plaintiff does not explicitly raise a Fourteenth Amendment deliberate indifference to medical need claim against Rose and Staples in his Complaint beyond stating "Plaintiff requested medical care but was denied and taken to jail instead." (ECF No. 96 at 3); *see Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018). Plaintiff's only discussion of medical care in his pleadings pertains to his excessive force claim. (ECF No. 188 at 9.) The Court therefore will not construe the Complaint as raising this unstated additional claim.

demonstrating officers had probable cause for at least one of these crimes. *See Holmes v. Vill. of Hoffman Est.,* 511 F.3d 673, 682 (7th Cir. 2007) ("[P]robable cause to believe that a person has committed *any* crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause." (citing *Devenpeck*, 543 U.S. at 153)).

The Court finds Rose and Staples had probable cause for at least misdemeanor domestic battery and felony home invasion, (as the Court concluded Officer Jones had for the February Arrest), based on the collective knowledge doctrine.[12] Under this doctrine, the Court looks "to the collective knowledge of all the officers involved in the criminal investigation although all of the information known to the law enforcement officers involved in the investigation is not communicated to the officer who actually makes the [arrest]." *United States v. Sutton*, 794 F.2d 1415, 1426 (9th Cir. 1986). The collective knowledge doctrine applies "where an officer (or team of officers), with direct personal knowledge of *all* the facts necessary to give rise to reasonable suspicion or probable cause, directs or requests that another officer, not previously involved in the investigation, conduct a stop, search, or arrest." *United States v. Ramirez*, 473 F.3d 1026, 1033 (9th Cir. 2007). Here, Officers Daniels and Pfaunmiller had "direct personal knowledge of all the facts necessary to give rise to … probable cause" through their investigation on May 28. *Id.* Officer Daniels directed RPD officers "not previously involved in the investigation," including Officers Rose and Staples, to "conduct a[n]…arrest" of Plaintiff through his Declaration of Probable Cause which Officer O'Farrell shared with all RPD officers. *Id.;* (ECF Nos. 182-38 (Declaration of Probable Cause), 182-27 (email from Officer O'Farrell citing to Officer Daniel's probable cause determination).) The Court agrees with Defendants that the collective knowledge doctrine applies here, which Plaintiff does not challenge. (ECF Nos. 182 at 24-26; 188.)

---

[12]The Court does not conclude or suggest officers did not have probable cause for the other three charges Plaintiff was arrested on. The Court merely invokes judicial efficiency as it may resolve Plaintiff's false arrest claim without analyzing probable cause for all five charges.

The remaining question is whether Officers Daniels and Pfaunmiller's "direct personal knowledge of all the facts" do in fact "give rise to … probable cause." *Ramirez*, 473 F.3d at 1033.

The Court finds the officers had probable cause that Plaintiff committed misdemeanor domestic battery. *See* NRS §§ 200.485.(1)(a), 33.018. Appling told Officers Pfanumiller and Daniels, as recorded on their body worn cameras, that Plaintiff kicked in her door, charged her, pinned her on the bed, and busted her lip. Appling also told Officer Daniels that she and Plaintiff were previously in a dating relationship and had a child in common subject to a joint custody agreement. The officers therefore had probable cause that Plaintiff applied "unlawful use of force or violence" against a "person with whom the [Plaintiff] has had … a dating relationship." NRS §§ 200.481(1)(a), 33.018.

In his response, Plaintiff cites to body worn camera footage and claims that at "~23:00 – Officer states nothing physical happened." (ECF No. 188 at 3 (citing ECF No. 188-5).[13]) Plaintiff argues this statement "directly contradicts the assault narrative" and that "[a] reasonable jury could interpret that statement as an admission that no assault occurred." (ECF No. 188 at 3.) However, the Court agrees with Defendants that upon reviewing the cited footage, there is no indication that any officer made this quoted statement. Before, during and after the 23-minute mark of Plaintiff's manually filed Exhibit 5, Officer Pfaunmiller is on the phone listening to Espinoza's account of the incident. (ECF No. 188-5 at 23:19:33-23:26:00.) At the 23-minute mark on the video player, Espinoza recounts from his Blink camera footage that Plaintiff dropped "the kid" off at the stairs and Officer Pfaunmiller asks Espinoza if Plaintiff threw the kid to the

[13]In his response, Plaintiff cites to "Pl. Ex. H – COR000051." (ECF No.188 at 3.) Throughout his response, Plaintiff cites to letters whereas his exhibit list and manual filing all refer to exhibit numbers. (ECF Nos. 189, 190 (Plaintiff's clarification regarding exhibits).) However Plaintiff identifies COR 000051 as Exhibit 5 in his index, which he reiterates includes "[s]egment reflecting officer statement that 'nothing physical happened.'" (ECF No. 189 at 2.) The manual filing video file is similarly titled "COR 000051(Exhibit5)."

ground or just placed him down and Espinoza said no, Plaintiff didn't hurt the kid at all just placed him on the first step. (ECF No. 188-5 at 23:24:00-23:24:25.) However, this comment is unrelated to the alleged battery of Appling. The Court therefore rejects Plaintiff' argument.

Plaintiff further argues that "Jessica did not affirmatively state Plaintiff struck her and did not know how any lip condition occurred." (ECF No. 188 at 5 (citing ECF Nos. 188-2, 188-5).) The definition of battery does not require striking, merely the "unlawful use of force or violence." NRS § 33.018. Appling told officers that Plaintiff "charged me, pinned me on the bed, and then I turned around and my lip was busted and then he grabbed my phone and pushed me on the bed." (ECF No. 182-17 at 23:04:00-23:04:15.) Plaintiff argues the evidence of assault is "ambiguous" because Officer Daniels' photographs of Appling's lip "show no visible swelling, bleeding, or laceration." (ECF No. 188 at 5 (citing ECF No. 182-24).) The Court agrees with Defendants that injury is not a required element of battery. (ECF No. 191 at 6.) Appling's statements alone, recorded and produced to the Court,[14] afforded officers sufficient probable cause to arrest Plaintiff for misdemeanor domestic battery.[15]

The Court also finds officers had probable cause that Plaintiff committed felony home invasion. *See* NRS § 205.067(1-2). The footage from the neighbor's Blink doorbell camera shows Plaintiff banging and kicking on Appling's door until he's able to open it up and enter the apartment. The neighbor, Espinoza, described and shared this footage with the officers the same night as the incident. In addition to herself recounting that Plaintiff kicked down her door, Appling also told officers that Plaintiff did not live at

---

[14]As the Court recounted with regard to DeLeon in the February Arrest, Appling's retraction of her statements *after* the May Arrest do not prevent a finding that the officers reasonably relied on her statements at the time to develop probable cause at the time of arrest. (ECF Nos. 96-1 at 10 (statement dated May 31, 2023), 11-12 (statement dated June 5, 2023); 189 at 13-16 (statement dated February 26, 2026)).

[15]As the Court discussed regarding the February false arrest claim, Plaintiff's argument here might prevent a jury from concluding, beyond a reasonable doubt, that Plaintiff in fact battered Appling. However, as the Court noted, Defendants need not make this showing to defeat Plaintiff's false arrest claim.

or have any belongings in her apartment. (ECF No. 182-17 at 23:11:28-23:11:35.) And while officers knew of a shared custody agreement between Plaintiff and Appling, this does not constitute permission to enter Appling's apartment. (ECF No. 188 at 3.) The Court finds the Blink camera footage[16] and the recorded statements by Appling gave the officers probable cause that Plaintiff "forcibly enter[ed] a dwelling without permission of the owner, resident or lawful occupant." NRS § 205.067(1).

Plaintiff emphasizes that portions of the produced body worn camera footage from the May 28 investigation are muted in various spots. (ECF Nos. 188 at 2-4, 10; 189 at 2, 58-59, 85.) Plaintiff argues that "[w]here recordings are incomplete, muted, segmented, or subject to competing interpretations, summary judgment is improper," citing *Vos v. City of Newport Beach*, 892 F.3d 1024 (9th Cir. 2018). (*Id*. at 2.) However in *Vos*, the Ninth Circuit found there were genuine factual disputes as to reasonable inferences drawn from (unmuted) footage. *See* 892 F. 3d at 1028, 1032. Here, Plaintiff offers no alternative inferences that may be drawn from the footage, either the muted or unmuted sections. Plaintiff does not indicate that any of the muted footage contains or even might contain information that would undermine probable cause. (ECF No. 182-15.) Plaintiff only argues that "Defendants cannot meet their Rule 56 burden by relying on incomplete recordings where key probable-cause discussions are muted." (ECF No. 188 at 4.) But the Court found Defendants had probable cause based on unmuted portions of the body camera footage as well as the footage from Espinoza's Blink camera. The Court is therefore not persuaded by this argument.

In sum, the Court grants Defendants' Motion and rejects Plaintiff's May false arrest claim.

///

[16]The Court acknowledges the limitations of the Blink doorbell camera footage. Specifically, the camera does not record continuously but only 20 second increments. (ECF No. 182-23 at 5-6, 23-25.) However, the 20-second clips produced to the Court provided all the information necessary for officers to conclude Plaintiff entered Appling's apartment forcefully and without consent. (ECF Nos. 182-20, 182-21.)

**2. Excessive Force**

Defendants argue Plaintiff's excessive force claim against Rose and Staples must fail because the officers acted reasonably and are protected by qualified immunity. (ECF No. 182 at 17-21.) Plaintiff argues the body camera footage reflects excessive force and that force against a restrained individual is an issue best addressed by the jury. (ECF No. 188.) The Court finds the officers did not apply excessive force constituting a Fourth Amendment violation and therefore does not reach Defendant's qualified immunity argument.

Plaintiff argues that "force against a restrained individual presents a jury question." (ECF No. 188 at 9 (citing *Graham*, 490 U.S. 386; *Santos v. Gates*, 287 F.3d 846 (9th Cir. 2002)).) The Court agrees with Plaintiff that excessive force inquiries "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [and therefore] we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Santos v. Gates,* 287 F.3d at 853. However, considering the entire interaction is captured on body camera footage from two different perspectives (ECF Nos. 182-16, 182-17), the Court can conclude on this record that there is no genuine dispute of material fact and that no reasonable jury could conclude Staples and Rose violated the Constitution as a matter of law.

The Court first considers "the severity of the intrusion" on Plaintiff's rights by looking to 'the type and amount of force inflicted.'" *Espinosa*, 598 F.3d at 537 (quoting *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003)). Plaintiff identifies multiple types of applied force: a take-down to the ground, knee pressure on his back, wrist manipulation, and application of a WRAP. (ECF No. 188 at 9.)[17] The Court considers and classifies each use of force in turn.

[17] Plaintiff also cites to being "slammed against the van" at 2:28 into Officer Rose's body cam. (ECF No. 188 at 9 (citing ECF No. 188-8).) The footage at this time shows none of Plaintiff's upper body in contact with the vehicle, such that Plaintiff can turn and face Officer Rose. (ECF No. 188-8 at 15:01:00-15:03:00.) Immediately before

First, a "take-down maneuver" may constitute "substantial" force in certain circumstances. *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021). However, "characterizing the amount of a non-lethal force" in these types of maneuvers "depend[s] on specific factual circumstances." *Id.* In *Rice v. Morehouse*, officers tripped the plaintiff while holding his arms behind his back so he fell directly on his face, resulting in severe long-term physical pain for which he received medical treatment. *See id.* Here, the officers pressed and guided Plaintiff down to the ground. (ECF No. 182-32 at 15:03:50-15:04:00.) Plaintiff ended up on his side with his face up and head raised, continuing to verbally taunt the officers. (*Id.* at 15:04:00-15:04:20.) Plaintiff does not allege any injuries to his face from the take down, though images taken by police show abrasions on his shoulders. (ECF No. 182-36.) Plaintiff requested cream, bandages, and ibuprofen for these "burns" while in custody on June 1. (ECF No. 96-3 at 13.) While absence of physical injury is not dispositive in excessive force cases, the "lack of significant injury to [Plaintiff] from this takedown" indicates the force was limited in nature. *Freeman v. C.C.D.C.*, No. 2:23-CV-01838-APG-EJY, 2025 WL 3707551, at *5 (D. Nev. Dec. 19, 2025); *see Wilkins v. Gaddy,* 559 U.S. 34, 36-37 (2010).

Second, the Court considers the knee pressure Officer Staples applied while Plaintiff was in a prone position. Like a take-down, this use of force can be substantial and dangerous depending on how it is applied. Significant knee pressure for an extended time while a suspect is prone, meaning lying face down, can cut off airways and result in death. *See Lombardo v. City of St. Louis, Missouri*, 594 U.S. 464, 467 (2021); *Drummond v. City of Anaheim,* 343 F.3d 1052, 1056–57 (9th Cir. 2003) (collecting cases). However, the footage here shows Officer Staples had his knee on Plaintiff's back for less than one minute. (ECF No. 182-32 at 15:04:25 – 15:05:05);

---

the officers take Plaintiff down to the ground, the footage shows the officers pressing Plaintiff against the police van for a few seconds, a moment Staples recounts in his declaration. (ECF Nos. 182-29 at 15:03:40-15:03:50; 182-32 at 15:03:40-15:03:50; 182-31 at 3.) However, the footage still shows Plaintiff's upper body mobile and not in contact with the van. The Court therefore will not separately address this alleged use of force.

*compare with Drummond*, 343 F.3d at 1054-55 (finding excessive force after two officers applied full body weight on plaintiff's neck and back for twenty minutes); *Lombardo*, 594 U.S. at 467 (denying officers' summary judgement where the officers placed pressure on decedent's back while in the prone position for fifteen minutes until he was pronounced dead). After the officers received confirmation that Plaintiff was calm, they rolled Plaintiff onto his side after instructing him not to thrash or move around. (ECF No. 182-32 at 15:04:50-15:05:10.) While Plaintiff yells that he can't breathe on the recording, he does so only after being turned on his side when officers are not placing any pressure to restrict airways. (*Id.* at 15:05:30-15:06:10.) The Court finds the less than one minute of knee pressure under the circumstances here constitutes minimally intrusive force.

Next, the Court considers the wrist manipulation Officer Staples employed while Plaintiff was handcuffed and prone on the ground. Footage shows that while Staples had his knee on Plaintiff's back, Staples manipulated Plaintiff's wrist while in handcuffs, pressing Plaintiff's fingers down until the moment Plaintiff is rolled onto his side. (ECF Nos. 182-32 at 15:04:40-15:05:10.) While neither officer mentions this action in their declarations, (ECF Nos. 182-29, 182-31), the act appears to be a form of pain compliance, twisting Plaintiff's wrists to subdue him. *See Forrester v. City of San Diego*, 25 F.3d 804, 805-06, 808 (9th Cir. 1994) (finding pain compliance measures including direct physical contact by officers twisting the wrists of nonviolent protesters resulting in bruising, a pinched nerve, and a broken wrist, did not constitute excessive force.) Plaintiff produced photographs with the Complaint (albeit undated) showing scarring on his wrists. (ECF Nos. 96-3 at 18-21; 182 at 31.) In considering the nature of the force applied, the Court notes from the footage that the wrist manipulation restraint lasted for less than 30 seconds. (ECF Nos. 182-32 at 15:04:40-15:05:05; 182-29 at 15:04:40-15:05:05.)

Finally, the officers placed Plaintiff into a WRAP. Staples and Rose, with assistance from the back-up officers, returned Plaintiff to the prone position for under

one minute while velcroing the WRAP restraint on Plaintiff's legs and torso. (ECF No. 182-32 at 15:07:10-15:08:05.) Rose checks in on Plaintiff during this time, asking if Plaintiff is alright. (*Id.* at 15:07:30-15:07:40.) Plaintiff responded with taunts and expletives but spoke clearly throughout his limited time in the prone position. (*Id.* at 15:07:40-15:08:05.) While the officers tightened straps around Plaintiff's chest and legs, Plaintiff yelled "can't go no tighter? Bet it can… shit don't hurt me." (*Id.* at 15:08:25-15:08-35.) During the interaction, Plaintiff described the experience to the officers as "humiliating," telling the officer "you can humiliate me all you want." (ECF No. 182-32 at 15:08:00-15:08:05, 15:08:40-15:08:45.) The Court does not dispute the humiliation of the WRAP restraint. (ECF No. 182-36.) But the Court finds its application here involved limited force.

The Court now looks to the *Graham* factors to determine whether these physical intrusions were reasonable under the circumstances. *See* 490 U.S. at 396. The Court find all three factors favor Defendants. First, the charges against Plaintiff outlined in the Declaration of Probable Cause were serious: four felonies and one misdemeanor. (ECF Nos. 182-1; 182-27); *compare with Rice v. Morehouse*, 989 F.3d at 1121 (denying summary judgement when officers implemented substantial force take-down maneuver after a minor traffic violation).

Second, Staples and Jones reasonably believed Plaintiff posed "an immediate threat to the safety of the officers or others" based on the probable cause email which warned that Plaintiff may be in possession of multiple stolen firearms "according to the victim." (ECF No. 182-27 at 2.) Plaintiff challenges this information, noting that Jessica Appling expressly disavowed sharing this information shortly after the May Arrest in a recorded body camera call. (ECF No. 188 at 6 (citing ECF No. 188-6).) Notably, this call occurred after the arrest and therefore does not reflect the information Officers Rose and Staples had at the time of the arrest. *See Medrano v. Acosta,* 2026 WL 2881583, at *5 ("We cannot judge the Officers' conduct through the lens of 'facts that [they] reasonably would not have known[.]'" (citations omitted)). Additionally, as Defendants

acknowledge, Jessica Appling did not provide this tip to police, rather her mother Laura Appling did. (ECF No. 191 (citing ECF No. 182-16 at 23:06:55 to 23:07:45).) While the probable cause email contained a clerical error, misattributing the information to Jessica rather than Laura, it does not alter Officer Rose and Staples' reasonable belief at the time of arrest that Plaintiff may have had multiple deadly weapons on him. Additionally, the officers asked Plaintiff upon handcuffing him if Plaintiff had anything on him they should know about but Plaintiff refused to answer. Ultimately, this second prong favors Defendants.

Finally, the Court finds that, even viewing the facts in a light most favorable to him, Plaintiff actively resisted arrest. On two separate occasions before the officers executed the take-down maneuver, Plaintiff yanked away from Office Staples and yelled to let him go. (ECF No. 182-32 at 15:00:45-15:00:10, 15:03:40-15:03:50.) During and after the officers take Plaintiff down to the ground, Plaintiff remained escalated and agitated, yelling at officers and passersby. (*Id.* at 15:03-50-15:06:00.) After the takedown but before applying the WRAP, Plaintiff attempts to sit up despite orders to remain still on his side. (*Id.* at 15:06:05-15:05:15.)

Plaintiff argues against this third factor, noting that his resisting arrest charges were ultimately dropped. (ECF Nos. 188 at 9 (citing ECF No. 189 at 56); 96-2 at 1, 9, 12.) However, the third *Graham* factor does not require a showing of successful prosecution for the crime of resisting arrest. The Court looks to the factual record submitted to the Court and, construing all reasonable inferences in Plaintiff's favor, finds there is no genuine dispute that Plaintiff actively resisted his arrest to some degree

Having found the three *Graham* factors favor Defendants, the Court concludes that Staples and Rose's use of force was reasonable under these circumstances. *See Santos v. Gates*, 287 F.3d at 853 ("'[N]ot every push or shove, even if it may seem unnecessary in the peace of a judge's chambers' is a violation of the Fourth Amendment.") The Court therefore grants Defendant's Motion and denies Plaintiff's excessive force claim from the May Arrest.

### 3. Unlawful Search

Defendants argue that their search of Plaintiff's vehicle after the May Arrest was lawful under the plain view and vehicle warrant exception. Plaintiff argues a firearm was not in plain view, rendering Defendants' search unlawful.[18] (ECF No. 188 at 7.) The Court agrees with Defendants.

Defendants argue that at the time of the May Arrest, officers had reasonable articulable suspicion ("RAS") that Plaintiff had firearms. (ECF No. 182 at 32.) Plaintiff argues this information was unreliable since the probable cause email stated the victim, Jessica Appling, told officers Plaintiff had firearms which Jessica denied in later affidavits as well as in a later recorded phone call with police. (ECF No. 188 at 6 (citing ECF No. 188-6).) The Court agrees with Plaintiff that "[p]robable cause cannot rest on speculative or unsupported information." (*Id.* (citing *Beck*, 379 U.S. at 89).) However, the officers do not solely rely on this tip, which in fact came from Jessica's mother, to establish probable cause. (ECF No. 191 at 7.) Rather, they argue this information constituted merely reasonable articulable suspicion to investigate further. *See United States v. Steinman,* 159 F.4th 550, 562 (9th Cir. 2025). The Court agrees.

Defendants argue this RAS developed into probable cause upon seeing firearm paraphernalia through the window of Plaintiff's car. (ECF No. 182 at 32-33.) "[T]here is no legitimate expectation of privacy ... shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers." *Texas v. Brown*, 460 U.S. at 740. The moment

---

[18]Plaintiff also argues the search was an unlawful search incident to arrest under *Arizona v. Gant*. (ECF No. 188 at 8 (citing 556 U.S. 332 (2009)).) However, because Defendants do not argue this was a search incident to arrest, the Court does not address this argument. Plaintiff further argues that ownership of the diaper bag and firearm is disputed. (ECF No. 188.) However, as Defendants note, actual ownership of the diaper bag and firearm are irrelevant in finding officers had probable cause that Plaintiff possessed or had in his custody or control a firearm as a convicted felon. *See* NRS § 202.360(1)(b). (ECF No. 191 at 10.) Plaintiff does not dispute he was the sole occupant of the vehicle where the diaper bag was found.

Defendants looked into the car is not recorded on the body camera footage, only the search itself. (ECF Nos. 182-30, 182-31.)

Plaintiff argues that stills of the body camera footage show no firearm is visible before officers begin searching and manipulating the bag.[19] (ECF No. 188 at 7.) The Court agrees with Plaintiff that the plain view exception does not allow officers to manipulate or open containers in order to discover contraband. (*Id.* (citing *Arizona v. Hicks*, 480 U.S. 321 (1987); *Horton*, 496 U.S. 128).) While the Court further agrees that a firearm was not visible before Officer Rose manipulated the diaper bag, Rose and Staples stated that Rose saw a plastic magazine and trigger guard through the window, rather than the entire firearm. (ECF Nos. 182-31 at 4; 182-28 at 4.) Reviewing the footage, the blue and white striped diaper bag is visible in the rear back passenger seat even through the tinted windows. (ECF No. 182-33 at 15:42:25.) The bag is fully unzipped. (*Id.*) While a bag of diapers is on top of the diaper bag, a black plastic rifle magazine protrudes out. (*Id.* at 15:42:29.) Moreover, the Court notes that immediately upon initiating the search, Rose directly goes to the diaper bag and extracts the rifle magazine right away. (*Id*. at 15:42:20-15:42:35.) The Court agrees with Defendants that "[t]his circumstantial evidence supports [the conclusion] that the Officers had already observed the firearm's presence and location inside the diaper bag through the vehicle's windows prior to initiating the search." (ECF No. 191 at 9.) The Court finds Plaintiff fails to raise a factual dispute challenging Rose and Staples account that Rose saw the rifle magazine and trigger guard from the apartment complex parking lot.

The Court agrees that the RAS that Plaintiff possessed a firearm based on the tip from Laura Appling, the plain view of firearm paraphernalia, and the background check confirming Plaintiff was a convicted felon gave Rose and Staples probable cause to believe the vehicle contained contraband for the crime of felon in possession of a

[19]The stills of the body camera footage that Plaintiff offers are too unclear and dark to support Plaintiff's assertion. (ECF No. 189 at 31-33.) The Court instead relies on the actual body camera video. (ECF No. 182-33).

firearm. *See* NRS § 202.360(1)(b). Under the vehicle exception, this authorized a lawful, warrantless search of Plaintiff's vehicle and the containers within, including the diaper bag. *See California v. Acevedo*, 500 U.S. 565, 580 (1991). The Court therefore grants Defendants' Motion as to Plaintiff's unlawful search claim.

**IV. MOTION TO FILE SUR-REPLY**

Plaintiff moves for the Court to grant him leave to file a sur-reply on Defendants' Motion. (ECF No. 192.) "A sur-reply may only be filed by leave of court, *and only to address new matters raised in a reply to which a party would otherwise be unable to respond*." *Kanvick v. City of Reno*, No. 3:06-CV-00058, 2008 WL 873085, at *1 n.1 (D. Nev. March 27, 2008) (emphasis in original) *see* LR 7-2(b). "Filing of sur-replies is highly disfavored, as it typically constitutes a party's improper attempt to have the last word on an issue—even where, as here, the filer is proceeding *pro se.*" *Smith v. United States*, No. 2:13-CV-039-JAD-GWF, 2014 WL 1301357, at *5 (D. Nev. Mar. 28, 2014) (citations omitted). Because sur-replies are discouraged, "[o]nly the most exceptional or extraordinary circumstances warrant permitting a sur-reply to be filed." *Stevens v. Prentice*, No. 2:17-cv-979, 2018 WL 3758577, at *1 (D. Nev. Aug. 8, 2018) (citation omitted). Plaintiff outlines three grounds for which he should be afforded leave to sur-reply. The Court finds none of these three bases merit additional briefing and therefore denies Plaintiff's motion

First, Plaintiff claims "[i]n their Reply, Defendants assert for the first time that Plaintiff 'charged' the alleged victim and 'pinned her down on the bed.'" (ECF No. 192 at 2.) Contrary to Plaintiff's claim, these "Undisputed Facts" appear word-for-word in Defendants' Motion with citations to the body worn camera footage and declarations Defendants filed with their Motion. (ECF No. 182 at 3, 5 (citing ECF Nos. 182-19 at 1; 182-17 at 23:03:40-23:05:20; 182-20 at 1, 182-18 at 23:03:00-23:10:00).) In reply, Plaintiff argues Defendants rely on shifting accounts of the incident "including inconsistent descriptions of whether Plaintiff 'smacked' a phone form the alleged

victim's hand or 'wrestled' over it." (ECF No. 194 at 2.) However, Defendants don't include either of these verbs in any of their briefing. (ECF Nos. 182, 191, 193.)

Second, while not entirely clear, Plaintiff suggests Defendants' reply indicates Jessica Appling was on the phone with her mother, Laura, rather than attempting to call law enforcement, at the time of Plaintiff's interaction with her. (ECF No. 192 at 3.) This fact, Plaintiff argues, contradicts Defendants' alleged probable cause to arrest Plaintiff for felony prevention of calling 911. (*Id.*) Because the Court already found probable cause to arrest for the crimes of domestic battery and home invasion, this additional information would not alter the Court's ruling.

Finally, Plaintiff argues Defendants rely on incomplete Blink camera footage from witness Zach Espinoza despite Espinoza's deposition confirming that the camera does not record continuously. (*Id.* at 3.) However, Defendants relied on this evidence in their initial Motion (ECF No. 182 at 6-7, 22-24) and Plaintiff had the opportunity to, and did, challenge this evidence by citing Espinoza's deposition in his response. (ECF No. 188 at 5.) Plaintiff merely "improper[ly] attempt[s] to have the last word on [the] issue." *Smith*, 2014 WL 1301357, at *5.

## V. CONCLUSION

The Court notes that the parties made several arguments and cited several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motions before the Court.

It is therefore ordered that Defendants' motion for summary judgement (ECF No. 182) is granted.

It is further ordered that Plaintiff's motion to file a sur-reply (ECF No. 163) is denied.

It is further orders that Plaintiff's motion for leave to manually file video exhibits (ECF No. 187) is granted.

The Clerk of Court is kindly directed to grant judgement in favor of Defendants and close this case.

DATED THIS 29th Day of September 2026.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE